**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
**APRIL K. DRYSDALE,**

                                        **Plaintiff,**

                        -against-

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 6/16/2015 __

**14-CV-01722 (SN)**

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Plaintiff April K. Drysdale brings this action pursuant to Section 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination

of the Commissioner of Social Security (the "Commissioner") denying her application for

Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI") (collectively,

"disability benefits"). The plaintiff moved, and the Commissioner cross-moved, for judgment on

the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

The Court finds that the administrative law judge ("ALJ") correctly applied the treating

physician rule, and the new evidence submitted to the Appeals Council is either cumulative or

not material. Accordingly, the plaintiff's motion for judgment on the pleadings is DENIED, and

the Commissioner's cross-motion is GRANTED.

## BACKGROUND

On August 30, 2010, Drysdale applied for disability benefits, alleging a disability onset

date of March 1, 2009, due to depression, bipolar disorder, and an injury to both arms. It is her

fourth application for benefits since 2002. On December 22, 2010, the Social Security

Administration ("SSA") denied the application, and Drysdale requested a hearing. Her request

was untimely, but the SSA found that she had "demonstrated good cause for the late filing by explaining that she had been preoccupied with pressing housing issues and court appearances to resolve rent arrears." (AR 161.) On February 9, 2012, Drysdale appeared for a hearing before ALJ Mark Hecht. On June 8, 2012, the ALJ denied Drysdale's application, finding her not disabled under the Act. Drysdale filed an appeal, to which she attached new evidence. On December 3, 2013, the Appeals Council declined to consider the newly submitted evidence and denied her request for review, rendering the ALJ's decision final. On March 5, 2014, Drysdale filed this action, and on August 22, 2014, *pro bono* counsel entered an appearance on her behalf.[1]

Drysdale and the Commissioner have each provided a summary of the relevant evidence contained in the administrative record. See Pl Mem. at 2-9 (ECF No. 45); Comm'r Mem. at 1-14 (ECF No. 47). The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit. We discuss the portions of the record pertinent to the adjudication of this case in section III below.

## DISCUSSION

I.     **Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

---

[1] The Court acknowledges and appreciates the appearance of *pro bono* counsel on behalf of Ms. Drysdale.

the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)).

"[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. August 21, 2012) (citation omitted). Without doing so, the ALJ deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in

any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.     Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 404.1520; Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003). The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. Second, the Commissioner determines whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. Third, if the claimant has a severe impairment, the Commissioner determines whether the claimant has an impairment included in the Listings. 20 C.F.R. Pt. 404, subpt. P, app'x 1.

Fourth, if the claimant does not have a listed impairment, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC"), despite her severe impairment, to perform past work. If not, the burden shifts to the Commissioner at the fifth and last step to show that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); Jasinski, 341 F.3d at 183-84. A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

The regulations provide additional guidance for evaluating mental impairments. 20 C.F.R. § 404.1520a(c)(1). Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). For mental disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or the "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B). The first three are rated on a "five-point scale": none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). A "marked" limitation is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(c). The last area – episodes of decompensation – is rated on a "four-point scale": none, one or two, three, and four or more. Id.

The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B).

The Diagnostic and Statistical Manual of Mental Disorders ("DSM") defines "bipolar disorder, mixed" as:

> a period of time (lasting at least 1 week) in which the criteria are met both for a Manic Episode and for a Major Depressive Episode nearly every day[]. The individual experiences rapidly alternating moods (sadness, irritability, euphoria) . . . . The symptom presentation frequently includes agitation, insomnia, appetite dysregulation, psychotic features, and suicidal thinking. The disturbance must be sufficiently severe to cause marked impairment in social or occupational functioning or to require hospitalization, or it is characterized by the presence of psychotic features []. The disturbance is not due to the direct physiological effects of a substance.

Am. Psychiatric Ass'n, DSM-IV 333 (4th ed. rev. 2000).

## III.    Analysis

On appeal, Drysdale argues that remand is appropriate because (1) the ALJ failed to apply the treating physician rule properly, and (2) the Appeals Council erred when it did not consider newly submitted evidence. The Commissioner argues that the Appeals Council's decision not to consider the new evidence was proper and that the ALJ's decision otherwise is free of legal error and supported by substantial evidence.

### A.      Treating Physician Rule

#### 1.      Standard

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). Affording a treating physician's opinion controlling weight reflects the reasoned judgment that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). See also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam); Mejia v. Barnhart, 261 F. Supp. 2d 142, 148 (E.D.N.Y. 2003) ("[A]s the report of a primary treatment provider, [the psychotherapist's] report should have been accorded more than 'little' weight." (citations omitted)).

Licensed clinical social workers are not "acceptable medical sources" due controlling weight under the treating physician rule, but they are still "important" "other sources" to whom the ALJ should look to show the severity of a claimant's impairments or ability to work. See Diaz, 59 F.3d at 313 (citing 20 C.F.R. §404.1527); 20 C.F.R. § 404.1513(a)-(d) (listing five categories of "acceptable medical sources"); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2-3 (Aug. 9, 2006).

Where mental health treatment is at issue, the treating physician rule takes on added importance. A mental health patient may have good days and bad days; she may respond to

different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination. See Canales v. Comm'r of Soc. Sec'y, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.") (citing Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009)).

The ALJ can discount a treating physician's opinion, however, if the ALJ believes that it "lack[s] support or [is] internally inconsistent." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). "When other substantial evidence in the record conflicts with the treating physician's opinion, [] that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ discredits the opinion of a treating physician, the regulations direct her to "always give good reasons in [her] notice of determination or decision for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); Snell, 177 F.3d at 134. The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6). She need not recite every piece of evidence in relation to these factors, however, so long as "the evidence of record permits [the Court] to glean the rationale of an ALJ's decision." Mongeur, 722 F.2d at 1040. See Marinez-

Paulino v. Astrue, 11 Civ. 5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2010) ("It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule."). "Failure to properly apply the treating physician's rule, or consider the required factors, constitutes legal error and is a sufficient basis for remand." Rolon v. Comm'r of Soc. Sec'y, 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014). See Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[B]ecause the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations . . . remand is necessary.").

## 2.    Application

The ALJ gave "significant weight" to the findings of treating psychiatrist Dr. Pierre-Antoine from his October 2011 report that Drysdale was "moderately limited" for most mental tasks. (AR 169.) Neither party disputes that this portion of the ALJ's decision is supported by substantial evidence and does not contain legal error. The ALJ gave "little weight," however, to the conclusion that Drysdale has "markedly limited ability to maintain socially appropriate behavior, respond appropriately to changes in the work setting, or tolerate even low stress work." (Id.) In so doing, the ALJ found that there is "simply no objective evidence" to support this conclusion. (Id.)

Drysdale contends that the ALJ set the bar too high when deciding whether to afford Dr. Pierre-Antoine's opinion controlling weight. She argues that requiring "objective evidence" guts the treating physician rule because that rule favors *opinions* supported by appropriate diagnostic techniques, not cold objective *facts*.

Drysdale's argument is well taken to the extent it highlights the value the SSA assigns to opinion evidence. But that opinion cannot be unmoored from clinical findings, which are, of

course, a form of objective evidence. And it cannot be substantially contradicted by the evidence

in the record. Dr. Pierre-Antoine's opinion is not supported by clinical findings and is

undermined by his own conclusions and the conclusions of other examiners. Accordingly,

because the Court must affirm the ALJ so long as the decision is supported by substantial

evidence and free of legal error – even if the Court might come to a different disability

determination – Drysdale's argument is rejected. See Brault, 683 F.3d at 448 (finding that "[t]he

substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a

reasonable factfinder would *have to conclude otherwise*" (citation and internal quotation marks

omitted; emphasis in original)); Alston, 904 F.2d at 126 ("Where there is substantial evidence to

support either position, the determination is one to be made by the factfinder.").

Drysdale saw Dr. Pierre-Antoine and social worker Gilbert Calcano of the Upper

Manhattan Mental Health Center ("UMMHC") bi-weekly for 21 months, beginning on March 9,

2010. Midway through her treatment, on October 29, 2011, Dr. Pierre-Antoine completed a

Psychiatric/Psychological Impairment Questionnaire. He identified the following "positive

clinical findings" in support of his opinion: poor memory; decreased energy; generalized

persistent anxiety; feelings of guilt/worthlessness; difficulty thinking or concentrating; and

disturbances of appetite, sleep, and mood. (AR 446.) These clinical findings are also consistent

with her "primary symptoms" that he identified as dysphoria, sleep disturbance, fluctuating

appetite, and poor concentration and memory problems. (AR 445.) He did not list a deficiency in

social functioning as a symptom. Moreover, Dr. Pierre-Antoine did not indicate other positive

clinical findings that would have supported the marked limitations he later identified and which

the ALJ rejected. For example, he did not select from a list of clinical findings that Drysdale

exhibits "hostility or irritability," "catatonia or grossly disorganized behavior," "social

withdrawal or isolation," or "illogical thinking or loosening of associations." (AR 446.) These findings would have been more consistent with a conclusion that Drysdale was markedly limited in her ability to maintain socially appropriate behavior, respond appropriately to changes in the work setting, or adhere to basic standards of neatness.

In addition, Dr. Pierre-Antoine concluded that Drysdale was "incapable" of even low work stress. (AR 457.) But again, when identifying the positive clinical findings to support his diagnosis, he did not select from the list "emotional lability" or "recurrent panic attacks" – both of which might be present for someone incapable of experiencing any workplace stress. (AR 446.) Finally, while Dr. Pierre-Antoine concluded that Drysdale's impairments – her generalized dissatisfaction with life and sleep, appetite, and mood disturbances – were expected to last 12 months and that she would likely miss work more than three times a month, he also diagnosed her as a malingerer. In light of these clinical findings, which the Court assumes are supported by diagnostic techniques, the ALJ was well within his discretion to reject certain of Dr. Pierre-Antoine's conclusions.

Otherwise, and throughout her treatment with Dr. Pierre-Antoine and Calcano, Drysdale was calm and cooperative with coherent and goal-directed thought processes and appropriate affect. These records are inconsistent with a marked limitation in social functioning. For example, at her January and February 2012 appointments, Calcano described her as well-dressed with fair insight and judgment. Drysdale described feeling anxious and depressed because she had moved in with her mother and her fourth disability benefits application was pending.

She also exhibited limited intellectual capacity and poor impulse control. Dr. Pierre-Antoine diagnosed Drysdale with multiple substance abuse and bipolar disorder, mixed (296.62), and assigned her a global assessment of functioning ("GAF") score that varied during her

treatment between 50 and 60. In a form letter dated November 19, 2011, Calcano checked a box indicating that Drysdale "is totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use is not a material cause of this individuals' disability." (AR 450.) He further concluded that her "use of drugs and/or alcohol is a symptom of her condition, and/or is a form of self-medication. The disability is independent of any use." (Id.) Despite continuing to struggle with alcohol and drug abuse, Calcano described her condition as "stable." (AR 459.)

The record also contains reports by providers at Conifer Park inpatient treatment program, consultative psychiatrist Dr. Haruyo Fujiwaki, and consultative internist Dr. Aurelio Salon. These records provide substantial support for the ALJ's findings.

Before being admitted to Conifer Park in May 2010, Drysdale reported that she had been using alcohol at a rate of four to five pints daily; using cocaine at the rate of an "eight ball" every three to four days; and was still smoking cigarettes, "3-4 pkg when high, 3-4 days per week." (AR 397-406.) Upon admission, mental status findings indicated that Drysdale was well-groomed, cooperative, and hyperactive. Her mood was moderately anxious and depressed, and her affect was appropriate. She reported isolation and poor sleep. Upon discharge approximately two weeks later, her mental status findings indicated that her thought process was coherent, goal directed and appropriate. She was diagnosed with general anxiety disorder. Her prognosis was "fair," and Drysdale was deemed "employable." (AR 393-94, 408.) She relapsed at least twice since her discharge. At her hearing before the ALJ on February 9, 2012, Drysdale admitted that she had started to use cocaine again the month before.

On November 9, 2010, Drysdale took the subway to her appointments with Drs. Fujiwaki and Salon. She reported that she was drinking two to three bottles of liquor two to three times per

week, and used cocaine one month ago. She self-reported feeling "always depressed," frequently

waking during the night, and sometimes hearing voices calling her name. (AR 409.) She

described being able to dress, bathe, and groom herself, but that she lacked the energy to "do

cooking, cleaning, laundry, and food shopping." (AR 411.) Dr. Fujiwaki found that Drysdale was

cooperative, related well to him, and had "adequate" social skills and overall presentation.

(AR 410.) Her thought processes were coherent and goal directed, her insight and judgment were

"fair to poor," and she had below average intellectual functioning. (Id.) Speaking to Drysdale's

RFC, Dr. Fujiwaki concluded:

> Vocationally, she is able to follow and understand simple directions
> and instructions. She can perform simple tasks independently. She
> has some difficultly to maintain attention and concentration. She
> is able to maintain a regular schedule with some difficulty due to
> substance abuse problems. She can learn new tasks with extended
> time. . . . She can make some simple decisions. She can relate with
> others and [] deal with stress to a certain extent.

(AR 412.) Dr. Fujiwaki attributed much of the limitations on Drysdale's ability to work to her

substance abuse. He diagnosed her with mood disorder not otherwise specified ("NOS"),

depressive disorder NOS, anxiety disorder NOS, psychotic disorder NOS, and alcohol and

cocaine dependence.

　　　Drysdale was also examined by Dr. Salon, an internist. The mental health screen was a

minor part of her overall physical examination (and Drysdale does not challenge the ALJ's

conclusions related to physical limitations). Dr. Salon noted that Drysdale was accompanied to

the exam facility by a social worker, dressed appropriately, maintained good eye contact, and

appeared oriented. He also found her affect to be "normal" and indicated that there was no

evidence of hallucinations, delusions, impaired judgment, or "significant memory impairment."

(ARE 416.)

The ALJ considered all of this evidence. Overall, all of the providers found that Drysdale consistently related well, was cooperative, and had coherent, goal-directed thoughts. She also consistently demonstrated fair to poor judgment, was limited to average intellectual functioning, and demonstrated poor impulse control. The ALJ acknowledged Drysdale's moderate impairments, but also found that her impairments were not as "marked" as she purports them to be. The evidence in the record supports the ALJ's decision to give "little weight" to the findings of marked limitation.

That the ALJ weighed the evidence and reached a different conclusion than another factfinder might have reached does not establish legal error. He was not required to afford every finding by Dr. Pierre-Antoine controlling weight in light of the less favorable findings in the record. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (where "the record plainly contained conflicting psychological evaluations of [the claimant's] present condition . . . it was within the province of the ALJ" to accept portions of a doctor's opinion while rejecting other portions); Snell, 177 F.3d at 133 (where the record contained evidence from several consultative physicians who made less favorable findings with which the treating physicians' opinions were "inconsistent," the treating physician's opinions were not due controlling weight) (citing 20 C.F.R. § 404.1527(d)(2)); Legg v. Colvin, 574 F. App'x 48, 49 (2d Cir. 2014) ("The ALJ appropriately noted that the objective medical evidence, the reports of other physicians, and [the treating physician's] own treatment notes did not support the diagnoses and serious functional limitations contained in his statements.").

Finally, despite Drysdale's significant impairments, DIBs and SSI are not simply a diagnosis-based benefits program: under the Act, it is not enough for an applicant to be diagnosed with bipolar disorder or to have some impairments. An applicant must have diagnoses

that impair her capacity *plus* an inability to do past work or adjust to other work. See 42 U.S.C.

§ 423(d)(1)-(2). It is the duty of the ALJ to weigh the evidence in the record and, where

appropriate, conclude that a claimant is not *so* impaired as to require a finding of disabled under

the Act. See Veino, 312 F.3d at 588. See Matta v. Astrue, 508 F. App'x 53, 56-57 (2d Cir. 2013)

(affirming the ALJ's denial of benefits to a claimant with bipolar disorder where "substantial

evidence revealed [the claimant's] condition stabilized and at the most, he had moderate

symptoms"). Accordingly, the ALJ's decision did not violate the treating physician rule when he

rejected some of Dr. Pierre-Antoine's findings.

### B.      New Evidence

#### 1.      Standard

"Disputes concerning the relevancy of diagnoses made after a denial of SSI benefits are

driven by the tension between the need for finality and the search for truth." Tirado v. Bowen,

705 F. Supp. 179, 181-82 (S.D.N.Y. 1989). "[C]laimants ordinarily should have but one

opportunity to prove entitlement to benefits, otherwise disability administrative proceedings

would be an unending merry-go-round with no finality to administrative and judicial

determinations. It is a truism nonetheless, that nothing is permanent except change, and for that

reason room must be allowed in the process for the fact that a claimant's medical condition may

not be fully diagnosed or comprehended at the time of her hearing." Tirado v. Bowen, 842 F.2d

595, 596 (2d Cir. 1988). As a result, the Court "must attempt to strike a balance between these

extremes." Tirado, 705 F. Supp. at 182.

Under 42 U.S.C. § 405(g), the Court may remand a case "upon a showing that there is

*new evidence* which is *material* and that there is good cause for the failure to incorporate the

evidence into the record in a prior proceedings." See also 20 C.F.R. §§ 404.970, 416.1570(b)

(emphasis supplied); Perez v. Chater, 77 F.3d 41, 44-46 (2d Cir. 1996); Tirado, 842 F.2d at 597;

Canales, 698 F. Supp. 2d at 341. Because new evidence submitted to the Appeals Council is part

of the administrative record for judicial review, however, a showing of good cause is not

necessary where the evidence was presented to the Appeals Council, but the Appeals Council

declined to consider it. See, e.g., Knight v. Astrue, 10 Civ. 5301 (BMC), 2011 WL 4073603, at

*12 (E.D.N.Y. Sept. 13, 2011).

    Evidence is new if it did not exist before the ALJ decision and it is not merely cumulative

of evidence already in the record. Tirado, 842 F.2d at 597. Evidence is material where it "relates

to the period on or before the date of the [ALJ] hearing decision," is probative, and there is "a

reasonable possibility" that it would have influenced the ALJ's decision. Id. See also 20 C.F.R.

§§ 404.970, 416.1570(b). Documents generated after the ALJ rendered a decision are not

categorically barred so long as the documents are relevant to the time period, before the ALJ's

decision, for which benefits were denied. Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004).

See 20 C.F.R. § 416.330 (a disability claim remains in effect through the decision of the ALJ).

This is because new evidence may "disclose the severity and continuity of impairments existing"

before the ALJ's decision and "may identify additional impairments which could reasonably be

presumed to have been present and to have imposed limitations" previously. Lisa v. Sec'y of

Dep't of Health and Human Servs., 940 F.2d 40, 44 (2d Cir. 1991). New and material evidence

will not warrant remand if it "does not add so much as to make the ALJ's decision contrary to

the weight of the evidence." Rutkowski v. Astrue, 368 F. App'x 226, 229 (2d Cir. 2010). See

also Perez, 77 F.3d at 45 ("When the Appeals Council denies review after considering new

evidence, we simply review the entire administrative record, which includes the new evidence,

and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.").

The vast majority of cases remanded to consider new evidence involve physical, rather than mental, disabilities. See, e.g., Patterson v. Colvin, 24 F. Supp. 3d 356, 373 (S.D.N.Y. 2014) (knee injury); Rolon, 994 F. Supp. 2d at 509-10 (herniated disc); Lopez v. Astrue, 03 Civ. 0313 (CBA), 2011 WL 6000550, at *11 (E.D.N.Y. Nov. 28, 2011) (lumbar and cervical spine); Melvin v. Barnhart, 02 Civ. 4527 (GBD)(JCF), 2004 WL 2591948, at *6-7 (S.D.N.Y. Nov. 8, 2004) (degenerative disc disease). Cf. Mulrain v. Comm'r of Soc. Sec'y, 431 F. App'x 38, 39-40 (2d Cir. 2011) (refusing to remand where the new evidence of the claimant's foot pain did not indicate that the condition was more serious than originally thought or that the condition had worsened); Beach v. Comm'r of Soc. Sec'y, 11 Civ. 2089 (JMF), 2012 WL 3135621, at *15 (S.D.N.Y. Aug. 2, 2012) (declining to remand because, "[a]lthough the new evidence supports [the claimant's] reports of joint pain in her ankles and hip," it "is more likely a reflection of [the claimant's] condition worsening after the cutoff date than an indication that she was disabled before the cutoff date.").

The results in cases involving new evidence related to mental developments are less consistent. In part, this is due to the difficulty of distinguishing between new evidence which "reflects the severity of the plaintiff's impairment as it existed during the time period for which benefits were denied" and that which "represents new impairments which would not have affected the decision below, and which would be better considered in a new application for benefits." Hernandez v. Sullivan, 91 Civ. 1836 (LBS), 1992 WL 315637, at *3 (S.D.N.Y. Oct. 22, 1992). See also Bosmond v. Apfel, 97 Civ. 4109 (RPP), 1998 WL 851508, at *12 (S.D.N.Y. Dec. 8, 1998) (inquiring whether a new "diagnosis relates to a previously unrecognized

condition, or whether it reveals the depth of an illness recognized, but not fully appreciated at the time of the hearing" (citations omitted)). <u>Compare</u> <u>Crowley v. Colvin</u>, 13 Civ. 1723 (AJN)(RLE), 2014 WL 4631888, at *4-5 (S.D.N.Y. Sept. 15, 2014) (remanding where newly submitted psychological evaluations, conducted after the ALJ's decision, affirmatively stated that the "onset of" the claimant's psychiatric impairments, which made him unable to work, predated and were present during the relevant time period before the ALJ decision), <u>with</u> <u>Brown v. Comm'r of Soc. Sec'y</u>, 709 F. Supp. 2d 248, 257-58 (S.D.N.Y. 2010) (declining to remand where new evidence regarding the claimant's pain, depression, and muscle spasms from a time period many years after the period in issue "provides no reliable information as to the severity or nature of his condition" *before* the ALJ's decision).

### 2.    Application

Drysdale submitted to the Appeals Council additional medical records that pertain to and are dated after June 8, 2012. These records are "new" because they "did not exist at the time of the ALJ's hearing." <u>Pollard</u>, 377 F.3d at 193. Further, a showing of good cause is not required because the new evidence was submitted to the Appeals Council and was a part of the record on appeal to this Court. <u>See</u> <u>Knight</u>, 2011 WL 4073603, at *12. The more difficult question is whether the evidence is (1) new, as in not merely cumulative, and (2) material, as in "relate[s] to the time period for which benefits were denied," and does not only "concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." <u>Tirado I</u>, 705 F. Supp. at 182 (citation omitted).

The new evidence includes (1) five months of social worker reports from Harlem East Life Plan Chemical Dependency Program ("Harlem East") from February 11, 2013 through July 13, 2013; (2) a one-time psychiatric assessment by Dr. Moussavian, dated July 1, 2013; and (3) a

one-time Federation Employment & Guidance Service ("FEGS") biopsychosocial assessment, dated August 20, 2013. The earliest of these is eight months after the ALJ's decision.

The Harlem East reports and Dr. Moussavian's report do not paint a significantly different picture of Drysdale than the evidence already considered by the ALJ. In the Harlem East reports, Drysdale exhibited average intelligence, was described as cooperative, motivated, and self-aware, and demonstrated positive communication skills. She also described feeling depressed, suffering from mood swings, and self-reported that she did "not want to work" and did "not want help to find employment and/or further education/training." (AR 118-32.) She was diagnosed with bipolar disorder, diagnosed a GAF of 60, and characterized as suffering from low self-esteem. In addition to her mental health impairments, the reports also demonstrate significant external stressors weighing on Drysdale: her recent homelessness, the absence of vocational training, her lack of family or peer support, limited recreational/leisure skills, and substance abuse. Despite these stressors, Drysdale reported attending Alcoholics Anonymous and Narcotics Anonymous and expressed interest in obtaining her GED. Dr. Moussavian's report is similar, but noteworthy for Drysdale's update that she stopped attending appointments at UMMHC and stopped taking her medications, causing her to feel more depressed and anxious. Accordingly, regardless of whether the Harlem East and Dr. Moussavian reports relate back to the time period before the ALJ's decision, they are cumulative of the medical evidence in the record and would "not add so much as to make the ALJ's decision contrary to the weight of the evidence." Rutkowski, 368 F. App'x at 229. See Tirado II, 842 F.2d at 597. They do not warrant remand.

The one-time consultative FEGS evaluation, conducted a month after Dr. Moussavian's report, represents stronger evidence of the severity of Drysdale's impairments – although it is

unclear whether Drysdale had resumed taking her prescribed medications and/or had reacclimated to them by that point. Dr. Hun Han opined that Drysdale would need a low stress environment, and that she has restrictions of activities of daily living that prevent adherence to a regular work routine. Dr. Beatrice Spinelli recommended that Drysdale's exertion level of her workload or pacing be modified, that she be allowed a flexible/modified schedule that allows taking leave as needed, that she be allowed to use stress reducing devices/equipment, and that she receive additional time to be trained. Both doctors ultimately concluded that Drysdale has substantial functional limitations to employment and a regular work routine due to medical conditions that will last for at least 12 months and make her unable to work.

The FEGS evaluation, however, is a one-time consultative examination based on Drysdale's self-reporting, rather than a doctor's longitudinal relationship with, and observations of, Drysdale. It is possible that, as a malingerer, her self-reporting does not accurately reflect her impairments. It is also possible that her condition worsened after the ALJ's decision because she was not compliant with her medications and continued to abuse cocaine and alcohol. The Court finds that this report does not necessarily disclose the severity and continuity of impairments existing before the ALJ's decision, make the ALJ's decision contrary to the weight of the evidence, or contain a reasonable likelihood of influencing the ALJ's decision. See Tirado II, 842 F.2d at 597; Lisa, 940 F.2d at 44; Rutkowski, 368 F. App'x at 229-30. As a result, it, too, does not warrant remand.

## CONCLUSION

For these reasons, the plaintiff's motion is DENIED, and the Commissioner's cross-motion is GRANTED. The Clerk of Court is directed to terminate the motions at Docket Entry No. 44 and 46 and close this case.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
              June 16, 2015